# JOHANNA S. ZAPP

12 East 86th Street, Suite 434, New York, New York 10028
917-742-4953 • 212-410-3351 • FAX 917-492-1879

ATTORNEY

NEW YORK, NEW JERSEY BARS

February 22, 2008

Honorable Alvin K. Hellerstein
U.S. District Judge
U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re: <u>U.S. v. Arturo Rojas-Jaimes</u> 05-CR-708

Dear Judge Hellerstein:

Arturo Rojas-Jaimes ("Rojas") is scheduled to be sentenced before Your Honor on February 26, 2008, at 3:00 P.M. Mr. Rojas plead on December 17, 2007 to Count 1 of the Indictment in accordance with a plea agreement. Mr. Rojas pled guilty to violating 18 U.S.C. § 1956 (h), Conspiracy to Commit Money Laundering. He will have been in custody for 13 months as of the date of the sentencing.

In this sentencing submission, we set forth information about Mr. Rojas' Background (p. 1-3; his involvement in the offense, p. 3-6; his severe head injury while at the M.D.C. p. 6-7; and our request for a downward departure in his sentence, p. 7-9), and ultimately a non-guideline sentence.

## Mr. Rojas' Background

Arturo Rojas-Jaimes is 57 years old; he will be 58 in April. He was born and raised in Caracas, Venezuela. He is one of four children born to Arturo Rojas and Matilde Jaimes. Matilde Rojas is 74 and lives in Venezuela. The defendant's father passed away in 1997.

Mr. Rojas had a very happy childhood. He felt loved, and has stated that "he was raised in a very special environment and that he had very special parents..he is extremely proud of his family and described them as very loving and affectionate." Pre-sentence Report (PSR), para. 42. His father worked in agriculture and his mother operated a small shoe store.

Mr. Rojas went to high school in Caracas and graduated in 1968. He went on to study economics for several years, but he left school one year short of earning his degree because he had to work at the same time, which interfered with his studies.

In 1970, Mr. Rojas married Consuelo Diaz. Arturo and Consuelo had one son together, Arturo Jr., who is 31 years old. Arturo and Consuelo separated in 1990. They remained very close, even up until the time of his incarceration. Mr. Rojas was not only close to Consuelo, but he had a very close relationship with his in-laws too, particularly Consuelo's brother who lived in Mexico.

In 1990 Mr. Rojas married Rosa Elena Sanchez. They have a daughter, Ariana who is 18 years old. Ariana is in college, studying law and liberal arts. While divorced from Ms. Sanchez, Mr. Rojas remains close to her.

For the last 25-30 years, Mr. Rojas has works in plastics distribution. Within the past 10 years, he worked for Alonso Micron, a company that distributes the raw materials needed for the production of plastic products. He also worked for Investments and Projects H.U.C. from 2002-2005, another plastics company.[1] Prior to his arrest, Mr. Rojas was the Director of Mercantil Pacific, a company that imports the raw materials of plastics.[2] The company has expanded to include the distribution of glass panels (used for glass doors, glass walls etc).[3] This company is still in business (although struggling), even in the defendant's absence. His son is helping to run it, along with Mr. Rojas's partners. Mr. Rojas hopes that upon his release he will be able to continue in his business.

The recent political situation in Venezuela caused problems for Mr. Rojas. In 2003, Mr. Rojas signed an "anti-Chavez" petition; thereafter the Chavez government issued an "order" of sorts that made it difficult for those who had signed the petition to work or obtain necessary licenses.[4] As a result, Mr. Rojas had one of his largest contracts taken

---

[1] Attached hereto as Exhibit A are letters from Mr. Rojas' employers and associates.

[2] See Exhibit B, defendant's Business Card and the Certificate of Commercial Registration for the Company.

[3] See Brochure, addressed to Mercantil Pacific C.A., Arturo Rojas Jaimes, for SADEV: Architectural Glass Systems "GlassTech 2006" also, see photographs of glass warehouse, attached hereto as Exhibit C.

[4] In early and mid-2003, Súmate, an opposition-aligned volunteer civilian voter rights organization, began the process of collecting the millions of signatures needed to activate the presidential recall provision In Chávez's 1999 Constitution. In August 2003, around 3.2 million signatures were presented… Reports then began to emerge among opposition and international news outlets that Chávez had begun to act punitively against those who had signed the petition, while pro-Chávez individuals stated that they had been coerced by employers into offering their signatures at their workplaces. (SEE: http://en.wikipedia.org/wiki/Hugo_Ch%C3%A1vez#2003.E2.80.932004:_Recall_vote)

away; following this, he went to Mexico, hoping that perhaps he could expand his plastics business there. He had family in Mexico: his first wife's brother was a plastic surgeon and ran a medical clinic in Mexico; he was still very close to this brother-in-law. From 2003 until about 2005, Mr. Rojas made several trips to Mexico investigating whether he could import raw materials from mines in Mexico, if his Venezuelan contractual issues were resolved. He also explored the possibility of starting a new project involving the production of glass. Times were rough, financially speaking, for Mr. Rojas, but he never stopped working in the plastics field.

While in Mexico, he usually stayed at the home of his brother-in-law.[5] Mr. Rojas became very close to his brother-in-law during this 2003-2005 period. Mr. Rojas was "down on his luck" and his brother in law was there to help support him in terms of offering him a place to stay and a place to work when Mr. Rojas was in Mexico. His brother in law was a very generous person, and Mr. Rojas was very grateful to him.

### Mr. Rojas' Involvement in the Offense

There came a time when Mr. Rojas realized that his brother-in-law was involved with illicit activity. He didn't know to what degree, but his suspicions were aroused because very frequently when his brother-in-law received a cell phone call, he would excuse himself and leave the room to take the call.

Mr. Rojas was never privy to these conversations and never knew who was on the other end of the conversation. There came a time in 2005 when Mr. Rojas' brother-in-law explained to Mr. Rojas that he was having a problem in New York City due to certain people not trusting each other and therefore refusing to perform an exchange of money. This was the first time that Rojas had heard anything about this subject. His brother-in-law suggested that if Mr. Rojas, who had been planning to go to New York City on business-pleasure trip,[6] would meet with these people and inform them that they should trust each other- that he (the brother-in-law) believed that it would induce them to effectuate the transfer of the money.

While Mr. Rojas doubted that his speaking to these individuals would convince them to "trust each other" and continue with their activities, he was reluctant to say no to his brother-in-law, to whom he felt a great debt of gratitude. In agreeing to what his brother-in-law proposed, he simply did not think through the implications of the request, and that he would be involving himself in something that could potentially cause him a great deal of trouble.

---

[5]The last time Mr. Rojas traveled to Mexico was on vacation with his son, his son's wife (Isabella), and his ex-wife Consuelo.

[6] He had planned to go to New York City to look into some possible business opportunities as well as for a vacation

In June 2005, Mr. Rojas traveled to New York City, to seek out work-related information, for vacation,[7] and to meet with the person his brother-in-law had asked him to see. The meeting took place in co-defendant Manuel Garcia 's car. At this meeting, Mr. Rojas expected to tell Garcia that he had been sent from Mexico to assure Garcia to trust the woman to whom he was supposed to transfer some money. After Mr. Rojas gave Garcia this message, Garcia become agitated and drove to a movie theater parking garage in the Bronx, got out of the car, opened his trunk and took out a suitcase, which he handed to the individuals who were at the garage. Mr. Rojas at that moment realized that a transfer of some sort had occurred. Mr. Rojas and Garcia then left the area.

The PSR, p. 7, para. 19 states: "On June 2, 2005, Nellie Agudello-Piedrahita and Jonathan Salazar traveled to a meeting with Manuel Garcia and Arturo Rojas-Jaime in the Bronx, New York. During this meeting, Garcia and Rojas-Jaime agreed together to deliver narcotics proceeds to Agudelo-Piedrahita and Salazar."

This is factually incorrect. Mr. Rojas never made an agreement to deliver narcotics proceeds, or any kind of proceeds to anyone. His role was very limited, and did not involve the transfer of any money. In fact he never expected that money would be transferred. He though he was just making an introduction. He became aware of the transfer literally as it was happening as he sat in the car as Mr. Garcia got out, went to the trunk of the car and transferred the bag.

In Mr. Rojas' allocution, when he pled guilty on December 17, 2007, he stated over and over again what he did. In fact, the Court made him explain it more than once for clarification.[8]

(Transcript, Dec. 17, 2007, pp. 14-15, lines 15-25, 1-6)

| | |
|---|---|
| The Court: | Tell me what you did, Sir. |
| The Defendant: | On June of 2005 I came for vacation to New York. I took the opportunity to meet with two people and put them in contact so they could do a transfer of money. |
| The Court: | I'm sorry? |
| Interpreter: | So they could do a transfer of money. |
| The Court: | You were going to help them transfer money? |
| The Defendant: | No. I was going to put them in contact so they could do it. |

---

[7] In fact, in the days after the meeting took place, defendant was taking scenic tours of New York City on those famous red double-decker buses.

[8] Plea Minutes, Attached hereto as Exhibit D

| | |
|---|---|
| The Court: | You were going to make a contact between them and somebody else? |
| The Defendant: | No, no. Between those two people. |
| The Court: | Oh, one with the other. |
| The Defendant: | Yes, because for some reason they had not done it yet and I was sent so I could get them, the two together. |

(Transcript, pp. 19-20 lines 6-25, 1-12)

| | |
|---|---|
| The Court: | Yes, but I don't understand your role, Mr. Rojas. Here your relative in Mexico calls you up and says go help party A transfer money to party B. You hardly know party A and you don't know party B, and the purpose of this is to move the money out of the United States outside of banking. |
| The Defendant: | Yes. Yes Your Honor. |
| The Court: | Does that summarize what happened? |
| The Defendant: | Yes. That's exactly how it happened. |
| The Court: | So what are you doing? What is your contribution to this? |
| The Defendant: | Because they—I don't know why, I don't know the reasons, they had not been able to do the actual transfer. When I came to New York I had been asked to do a favor to make them trust each other so they would trust each other and go ahead with the transaction. |
| The Court: | How did you make them trust each other? |
| The Defendant: | When I get here I called the person here in New York who was already aware that I was coming sent by the person down in Mexico. And the person who had already met me in Mexico, my meeting was really very, very brief. Just a few minutes. |
| The Court: | So you had the trust of these people? |
| The Defendant: | Well, I come, sent by a person who was – whom they trust. |
| The Court: | And you were connected to that person whom they trusted? |

The Defendant:    Yes. Yes. But, the person here in New York, the one who has to deliver the money gave me the impression that they didn't trust me very much because that same night the money was delivered and he left that same night.

The PSR p 7, para 20 states: "On June 2, 2005, in the Bronx, New York, Manuel Garcia and Arturo Rojas-Jaime transferred a bag containing approximately $300,000 in narcotics proceeds to Jonathan Salazar." This is also factually incorrect. At no time did Mr. Rojas ever make any transfer of a bag of money to Jonathan Salazar. Mr. Rojas was in the car unaware of Mr. Garcia's plan to transfer the money. The meeting with co-defendant Garcia was not supposed to involve a transfer of money; rather, it appears that Garcia made the transfer at that time because he was unhappy with the way things were developing, and wanted to avoid the need for further contact with the other individuals. Mr. Rojas only realized the transfer happened after the fact.

**Mr. Rojas's Head Injury**

On June 11, 2008, defense counsel received a call from defendant's family in Venezuela that "something happened" to Mr. Rojas at the M.D.C. I learned that Mr. Rojas had been taken to Lutheran Medical Center and I met Mr. Rojas' son, who had arrived from Venezuela, at the hospital after Mr. Rojas had come out of surgery.[9] Apparently as a result of falling out of his top bunk at the MDC the prior evening,[10] Mr. Rojas had suffered a subdural hematoma,[11] which resulted in surgery that involved the removal of almost half of Mr. Rojas' skull ("hemi-craniotomy")

Dr. DeMattea's narrative illustrates exactly what Mr. Rojas has been through, medically speaking, over the last month and a half. However, what it fails to mention is that on the day that Arturo Jr. arrived to see his dad in this horrific condition, Arturo Jr.'s mother, Consuelo was 24 hours away from dying. Several months prior to this, Consuelo was diagnosed with stomach cancer.[12] No sooner had Arturo Jr. arrived in New York City

---

[9] When we first saw Mr. Rojas' his head was so swollen from the surgery that he was completely unrecognizable to his son.

[10] According to medical records, he was found by his cell mate on the floor very early in the morning, and had no recollection of how he had arrived there. Ironically, and tragically, Mr. Rojas' records state that he was supposed to be placed in a lower bunk, but that directive was ignored or overlooked. See Exhibit E

[11] Attached hereto as Exhibit F is Dr. DeMattea's Narrative Report on Mr. Rojas' injury and surgery. Also, Exhibit E is a series of photographs of Mr. Rojas post injury.

[12] Attached hereto as Exhibit G are photographs of Consuelo Diaz taken within a year of each other.

following his father's surgery than he was told that he would have to return home the next day for his mother's funeral because she probably would not make it through the night. Ariana, Mr. Rojas' daughter, and her mother Rosa Elena also arrived almost immediately to be at Mr. Rojas' bedside.

Following the surgery, Mr. Rojas gradually became more alert; he was moved out of the ICU,[13] and eventually to a rehabilitation facility. (On February 5th, he had additional surgery to replace the skull piece that had been stored in his abdomen, which was completed without incident.) Following that surgery, he was returned to the rehabilitation facility. From my conversations with the defendant, it is apparent that he has suffered some memory loss, and he has trouble recalling basic words, and the doctor's report submitted herewith attests to the fact that Mr. Rojas has suffered some cognitive impairment as a result of his injury.

### Request for Downward Departure and Non-Guideline Sentence

As the Supreme Court recently opined in *Gall v. United States*, 128 S.Ct. 586 (2007), a sentencing court should begin by correctly calculating the applicable Guidelines range, but the Guidelines are not the only consideration. After permitting both parties to argue for a particular sentence, the sentencing court should consider all of 18 U. S. C. §3553(a)'s factors to determine whether they support either party's proposal. The Court may not presume that the Guidelines range is reasonable, but must make an individualized assessment based on the facts presented.

We urge the Court to downwardly depart from Mr. Rojas-Jaime's sentencing guideline range because his involvement in the money-laundering offense to which he pled guilty constituted aberrant behavior, and impose a non-guideline sentence precisely in view of the "facts and circumstances" of the case (§3553(a)(1)). Under the "circumstances" no one would quarrel with a lower non-guideline sentence as being disrespectful of the law in this case.

Section 5K2.20 of the Sentencing Guidelines gives a district judge the discretion to depart in an "extraordinary" case where the defendant's criminal conduct constituted "aberrant behavior." A court may exercise this discretion to depart for aberrant behavior only where the offense is "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20, cmt. n. 1.[14] *United States. v. Castellanos*, 355 F.3d 56 (2d Cir. 2003).[15]

---

[13] Mr. Rojas asked where his son was, but his family told him that he had some paper work to take care of in Venezuela and that he would return in a few days. They did not want to tell him about Consuelo for fear that it would be too painful and might interfere with his recovery.

[14] "In determining whether the court should depart on the basis of aberrant behavior, the court may consider the defendant's (A) mental and emotional conditions; (B) employment record; (C)

-7-

Mr. Rojas meets this test. His involvement in the money-laundering offense was so minimal that the PSR and the Government recommends that he be given a minimal role adjustment of 4 levels, ["it does not appear that Rojas-Jaime had an involvement other than a single transaction" ]on June 2, 2005, involving his meeting with the three other individuals mentioned in the Report. PSR, para 30. There is no evidence that Mr. Rojas' involvement in this offense involved "significant planning;" rather, he simply agreed, while he was going to be in New York anyway, to do a favor for a relative who had been hospitable to him, by introducing two individuals to each other.

Notably, he was neither promised nor did he receive anything for performing this favor. Finally, Mr. Rojas's involvement in this offense represents a marked deviation from an otherwise law-abiding life of almost 60 years. Mr. Rojas have no criminal background, and has worked during his adult life as a businessman and head of a plastics manufacturing company.

Moreover, given Mr. Rojas's lack of personal involvement in or benefit from the underlying offense, the quantity-based guideline structure makes his a particularly appealing case for a departure and non-guideline sentence. Thus, even though there is nothing to suggest that Mr. Rojas had any idea that a sum of money was going to be transferred at the meeting he attended, much less that the sum was $300,000, the money laundering guideline increases his offense level from a base offense level of 8 to a level 20 due <u>solely</u> to the amount of money in the suitcase. Many courts have been critical of the quantity-based nature of this and other guidelines. See, e.g., United States v. Milne, 384 F.Supp.2d 1309, 1312 (E.D. Wis. 2005) ("With their almost singular focus on loss amount, the guidelines sometimes are insufficiently sensitive to personal culpability").[16] While the Government was willing to permit Mr. Rojas to plead to a "1957" charge, (thus

---

record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense." U.S.S.G. § 5K2.20, Application Note 2.

[15] In *Castellanos*, the Circuit approved the District Court's refusal to grant an aberrant conduct departure where the defendant had planned her involvement in the narcotics offense more than a week before it occurred and where she perjured herself at trial regarding her role, and encouraged others to perjure themselves as well.

[16] See also, United States v. Ennis, 468 F.Supp.2d 228, 230 (D. Mass. 2006) ("And since the Guideline drafters did not bother to describe the reason for making quantity talismanic, the sentencing purposes advanced by the quantity guideline, §2D1.1, or what to do when quantity-driven sentences are wholly at odds with any rational sentencing scheme, judges were left 'just to weigh the drugs and mechanically compute the offense level.'"); *United States v. Adelson*, 441 F.Supp.2d 506, 509 (SDNY 2006)(Rakoff, J)("As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities such as the weight of drugs in narcotics cases . . . without, however, ever explaining why it is appropriate to accord such huge weight to such factors.").

reducing his guideline level another point) the elements require for such a plea, to wit, involvement of a financial institution, to plea to that charge.

Although the Pre-sentence recommends that Mr. Rojas received the benefit of downward adjustments in his guideline range based on his minimal role and acceptance of responsibility, the resulting guideline sentence range is 37 to 46 months, a longer than necessary sentence for making the mistake of agreeing, as a favor to his ex-brother-in-law, to introduce one individual to another. It should also be noted that with respect to the issue of aberrant conduct the Probation department has stated that "…while we note that this 57 years old defendant has apparel led an otherwise law abiding life we will leave determination in this area to the Court." (PSR, P.15)

**Aberrant Conduct**

The decisions in this Circuit applying §5K2.20 show that courts have downwardly departed from an otherwise applicable guidelines range in circumstances similar to Mr. Rojas's, even before *Booker* and its progeny broadened the scope of a district court's sentencing discretion. For example, in *United States v. Hued*, 338 F.Supp. 453, (SDNY 2004) Judge Marrero granted the defendant an aberrant conduct departure, finding that she had been an upstanding member of the community throughout her adult life and had quickly admitted her own culpability and made efforts to mitigate the effects of her offense; the extent of the departure in that case was from level 21 to level 11.

Mr. Rojas has been incarcerated for this offense since January 24, 2007; by the date of sentencing, he will have been in jail for 13 months. If this Court were to afford him a 7-level downward departure based on the aberrational nature of his conduct,[17] and taking into account the severe injuries he incurred while incarcerated,[18] it would be possible for Mr. Rojas to be released from prison and deported back to Venezuela. Accordingly, we request that the Court downwardly depart from this guideline range and sentence Mr. Rojas to 16 months which is the time he has already served. It is respectfully submitted that reduction of this amount is not inappropriate.

---

[17] A 7-level downward departure on aberrant behavior grounds was afforded by Judge Sheindlin in *United States v. Chen*, 2005 WL 3288022 (SDNY 2005)

[18] In *United States v. Barbato*, 2002 WL 31556376 (SDNY 2002), although Judge Kram did not feel the defendant merited an aberrant behavior departure (because his conduct was not confined to a single occasion), she did grant him a 7 level downward departure because of his ill health, citing U.S.S.G. § 5H1.4, which provides that a departure is permitted for physical impairment where such a factor is present "to an exceptional degree." *Koon v. United States*, 518 U.S. 81, 95-96, (1996); *see also United States v. Jimenez*, 212 F.Supp.2d 214, 216 (SDNY 2002). Mr. Rojas's physical impairment, resulting from his falling on his head out of his top bunk at the M.D.C., is certainly sufficiently severe to merit a comparable downward departure.

For Your Honor's benefit, attached hereto as Exhibit H, are photographs of Mr. Rojas and his family. Your Honor will find in Exhibit H two letters from Mr. Rojas' children, who are both very exceptional people. Because of the circumstances explained above, I have spent a significant amount of time with both of them. As Judge Buchwald stated during a recent sentencing proceeding I had before her: "…they say you can't judge a book by its cover…but I really do think you can tell a lot about a man by his children…"[19]

Attached as well as Exhibit I, are Mr. Rojas' own reflections on what has transpired.

Respectfully Submitted,

Johanna S. Zapp
Attorney for Arturo Rojas-Jaimes

cc: AUSA Guruanjan Sahni

P.S. Today, February 22, 2008, Mr. Rojas received the news that he would be moved from the rehabilitation center and returned to the M.D.C. He said, "I don't know if I have the strength to deal with this."

---

19 U.S. v. Rodriguez, 07 CR 173, July 18, 2007 Sentencing Minutes, P. 11. Defendant was charged with being a felon in possession of a weapon. He had led an exemplarily life for the past 20 years, Judge Buchwald felt he posed no threat to society and sentenced him to a non-guideline sentence of Probation.